## AMERICAN LOAN & TRUST Co. *v.* TOLEDO, C. & S. RY. Co. *et al.*

*(Circuit Court, N. D. Ohio, W. D.*   October 24, 1890.)

**1. CONTRACT—COMMISSIONS.**

A finance company agreed to negotiate the sale of $800,000 of railroad bonds for a commission of 10 per cent. payable in the bonds. Afterwards the parties to this agreement entered into an agreement with a third person, in which the latter agreed to make a loan to be secured by pledge of part of these bonds, and it was provided that $80,000 of the bonds should be appropriated to the finance company in payment of its claims for commission. *Held,* that the second agreement passed title to the $80,000 of bonds to the finance company, although it had not then negotiated a sale of the $800,000 of bonds.

**2. SAME—RESCISSION—WAIVER.**

A contract between the owner of a railroad and a finance company provided for the organization of a new company, of whose directors a majority should be named by said owner, who should be president, and whose bonds should be sold by the finance company. *Held,* that the failure to elect the former owner president, and to allow him to name the directors, was not ground for his rescinding the contract, where the election of the president and directors took place at a meeting at which he was present, and voted for the persons elected.

**3. SAME—REASONABLE TIME.**

Said contract did not limit the time within which the bonds were to be sold. *Held,* that the failure to sell them within 16 months was not ground for rescinding the contract.

In Equity. Upon exceptions to master's report.

*Blair & Rudd* and *E. D. Potter, Jr.,* for complainants.

*Doyle, Scott & Lewis* and *Robert Ludlow Fowler,* for defendants.

BROWN, Justice. This proceeding involves the ownership of 112 bonds of the defendant company, 80 of which are claimed by Burke & Hickox, assignees of Theophilus P. Brown, upon the one hand, and by holders deriving their title from the American Finance Company, upon the other. This suit was originally begun to foreclose a mortgage given to secure these and a large number of other bonds. A decree of foreclosure and sale was entered in July, 1887, and sale was made under such decree in October, 1888, and an order confirming the same was entered in February, 1889. Messrs. Burke & Hickox became the purchasers of the road under the foreclosure and sale. The decree adjudged that 825 bonds of the defendant company had been issued and were "outstanding as legal and valid obligations of said defendant company." It was also found that 89 others of such bonds were outstanding, the validity of which was denied. The question of such validity was continued for further hearing. The decree provided that the property should be sold for not less than $600,000, with a proviso that at least $100,000 should be paid in cash to be returned into the court for distribution. It was further ordered that all matters involved in the various intervening petitions, together with the validity and ownership of the 89 bonds mentioned, should be referred to a special master, to report the testimony, with his findings of law and fact, to the court. The bonds in controversy in this case form no part of the 89 mentioned in the decree, but were all embraced in the 825, the validity of which was adjudged. Subsequently this decree was modified so far as to permit Burke & Hickox to file a bond, with sure

ties to the satisfaction of the clerk, that they would pay all sums of money ordered by the court to be paid from the proceeds of the sale of said road, and to comply with all the other orders of the court; such bond to supersede the cash payment of $100,000.

The right to 80 of these bonds, the principal ones in dispute, turns largely upon the construction given to two agreements, of April 14 and September 24, 1884, to both of which Theophilus P. Brown, who claimed to be the owner of these bonds, was a party. It seems that, prior to the execution of the first of these contracts, the Toledo & Indianapolis Railway Company owned and operated a line of railway from Toledo to Findlay, Ohio; that the bonds and stock of said railway were capitalized at $800,000, all of which was owned or controlled by Brown, who was also president of the road. All of these bonds were hypothecated for the construction debts of the road, and the stock was worthless. The company was insolvent, and Brown had not the requisite means to redeem or take up the bonds. Suit had been begun to foreclose the mortgage securing the 800 bonds, and the road was in the hands of a receiver. In this condition of things, Brown, early in 1884, applied to the American Finance Company for assistance in reorganizing the road, paying off its indebtedness, and extending the line of railway to Columbus and the Hocking valley. Thereupon the agreement of April 14, 1884, was entered into between Brown upon the one part, and the American Finance Company upon the other. This agreement, after reciting that Brown was the owner of all the bonds, and substantially all the stock of the company; that the road was in the hands of a receiver; that there were sundry liens and unsecured claims for right of way, labor, and material; and that Brown was desirous of obtaining a loan to retire these claims and obligations; and also to extend the road to Columbus, and to some point in the Hocking valley,—provided, in substance, as follows:

(1) Brown was to sell the stock, bonds, and all the property of the railway company to a new company, to be organized by the finance company.

(2) The finance company to proceed to the organization of the new company; to procure the engraving of the bonds and stock, and the settlement of outstanding claims; to procure a loan of from three to four hundred thousand dollars upon the pledge of the present bonds of the Toledo & Indianapolis Railway Company, or upon the bonds of the new company; the cash proceeds of these bonds to be used in extending the road, in canceling loans prior to the mortgage, and the settlement of other claims; such loans to be secured by Brown's notes, with the bonds, at not more than 50 cents on the dollar.

(3) The stock and bonds of the new company to be used for the purchase of the stock, bonds, and property of the old company, in payment of its debts and in extending its road, the stock of the new company to be fixed at $25,000 per mile, and the bonds at $20,000, and to have 40 years to run, at 6 per cent. interest.

(4) The stock and bonds of the new company to a certain amount to be paid for in the stock, bonds, and property of the old company, and

the remainder of the bonds and 45 per cent. of stock to be negotiated, and the proceeds used in extending the line.

(5) The finance company to undertake the negotiation of the entire issue of the bonds and 45 per cent. of stock of the new company for the means necessary to retire the securities of the old company, take up the claims, and extend the road.

(6) The finance company to have a commission of $2\frac{1}{2}$ per cent. upon the money raised "by way of loans, or by means of the settlement of the claims."

(7) The finance company to have the right to negotiate the sale of the $800,000 of bonds of the old company, and also to have the right to negotiate all the bonds and 45 per cent. of the stock to be issued by the new company for the purposes expressed in this agreement.

(8) The finance company to have the right to negotiate the settlement with the rolling-mill of Chicago, and to use therefor the bonds and stock of the new company.

(9) The finance company to receive, "in consideration of the premises," a commission of "ten per cent. on the face or par value of the bonds and stock issued, and to be issued, by said railroad companies and negotiated;" said 10 per cent. on said bonds being payable in said bonds at par, or in the net cash proceeds of the sale therefor, at its option, and on said stock in said stock at par; "such payment or deliveries to be made from time to time, *pro rata*, as any of said bonds shall be negotiated, sold, or exchanged for outstanding liabilities, or for property, labor, and materials required by said railroad companies, or either of them, or otherwise used or disposed of."

(10) In addition to this commission, there was appropriated to the finance company, in further consideration of its undertaking to secure the marketing of the bonds, 45 per cent. of the capital stock of the new company.

(11) Brown was to be elected president of the new company, to have 45 per cent. of its stock, and the naming of a majority of the board of directors of the new company.

The other articles of this contract are not necessary to be considered here. The general purpose of the contract was twofold: *First*, the procuring of the temporary loans of three or four hundred thousand dollars to relieve Brown, and redeem the bonds of the road which had been pledged to its various creditors; *second*, to sell and dispose of bonds to repay this temporary loan, and reinstate Brown in the control of the road. It is claimed by the finance company that the recital in the introduction to this agreement of Brown's ownership of the bonds is untrue; that, in fact, all of these bonds had been issued and delivered to the creditors of the road as security for their claims. We do not, however, regard the exact interest of Brown in these bonds as material in the consideration of the question before us. In entering into the contract, he assumed to be the owner of bonds, the finance company dealt with him as such, and no other person has set up a claim to them in these

proceedings; and we are bound to treat the case as if he were the legal owner, though it appears very clearly that such ownership was not absolute, but that the bonds were pledged to sundry creditors of the road; and, in putting a construction upon these contracts, it is perfectly proper to consider this as one of the circumstances surrounding the transaction.

It further appears, and it is not disputed, that the commission of 2½ per cent. provided for in the sixth article of this agreement upon the amount of money raised by loan, namely, $8,125, has been paid, and the only controversy between these parties relates to the commission of 10 per cent. provided for by the ninth article, upon the face or par value of the bonds and stock issued and negotiated. The determination of this question requires us to consider the further transaction between these parties. Little appears to have been done under the contract above mentioned for several months. Although Brown's notes to the amount of $325,000 had been made and delivered to the finance company, the necessary collaterals did not accompany them, and no loan had been secured. It was realized that some way must be found to raise the money in advance of the delivery of the collaterals, so that the money so raised might be used to release the collaterals from the existing liens upon them. In September the finance company succeeded in enlisting the aid of Mason & Jillson, of Providence, R. I., and upon the 24th day of September, 1884, another contract, known as the "tripartite agreement," was entered into between Brown of the first part, the finance company of the second, and Mason & Jillson of the third part. This agreement, after reciting the prior contract, and the fact that the finance company had requested Mason & Jillson to take Brown's notes on behalf of themselves and associates, provided that Brown should make his notes payable to his own order within two years, with interest at 6 per cent., to be accompanied by first mortgage bonds of the Toledo & Indianapolis Railway Company, at the rate of 50 cents on the dollar, as collateral security; that the net proceeds of the loan were to be applied to the purchase of outstanding claims against the road, and also to the building of the extension; that all outstanding claims so purchased should be assigned to the American Finance Company, in trust; that, if any of the proceeds of the loan should remain after the purchase and delivery of the claims, it should be paid over to Brown. The stock of the railway company was to be deposited with the finance company. A bonus of 10 per cent. on the amount of the bonds pledged as collateral security was to be paid to the purchasers of the notes. Brown was to forward or retard the foreclosure of the mortgage, as the holders of the notes might deem advisable. The ninth article of the contract was as follows:

"All the remainder of said $800,000 of first mortgage bonds of said Toledo & Indianapolis Railway, over and above the $650,000 of the same pledged to secure the payment of said $325,000 of said notes, are hereby appropriated as follows: *First*, to the purchasers of said notes, their said bonus, amounting to $65,000 thereof, to be distributed among them *pro rata*, according to their respective holdings of said notes; *second*, to said American Finance Company $80,000 thereof, in full payment of all its claims for commission for negotiat-

ing the said $800,000 of said bonds; *third*, to said Brown $5,000 thereof,—such appropriation and the delivery of said bonds to be made from time to time *pro rata*, as said notes are disposed of."

The other provisions of the contract are unimportant in this connection.

Immediately after the execution of this contract the commission of 2½ per cent. provided for by the first contract was charged up against Brown upon the books of the finance company.

It is insisted by the exceptors to this report that, inasmuch as the $800,000 of the bonds and stock were never negotiated or sold or exchanged for outstanding liabilities, the commission of 10 per cent. provided by the ninth article of the original agreement was never earned; that the $80,000 bonds which were deposited with the finance company should be treated as having been held in a trust which has failed, and should be surrendered to them as the assignees of Brown, the original owner. It may be true that the bonds and stock were never negotiated or sold as provided in the agreement, and yet it was perfectly competent for these parties to treat the transaction with Mason & Jillson as a fulfillment of the obligations of the finance company with respect to these bonds, or as entitling them to a commission of 10 per cent., irrespective of their original obligation. This is apparently what was contemplated by Short in his letter to Brown of September 16, 1884, written while the negotiations with Mason & Jillson were pending, and eight days before the execution of the second contract. In this letter he speaks of his negotiations with Mason & Jillson, and, after mentioning the terms upon which they seemed to be willing to make the loan, added:

"Our company cannot afford, of course, for the little two and one-half per cent. commission on the loan, only, to use its position and capital to set the road on its feet, and take the risk of your death, and any contingency that might otherwise arise; and hence we and Messrs. Jillson and Mason are treating the negotiation as a sale of the bonds, but, in doing this, our company extinguishes all its claims for commission, so far as the present portion of the road is concerned."

It is true that Mr. Short in his letter speaks of depositing its $80,000 of bonds in trust "along with yours and theirs," but immediately follows this up by adding: "We will not be entitled to any commission on the bonds of the new company to be issued to take up the old." The word "trust" here seems to have been somewhat loosely used, and it is difficult to see exactly what Mr. Short intended. Brown's reply to this letter was entirely non-committal. It simply acknowledged its receipt; said that he had only read enough of it to know when to expect Short at Northampton, and arranged to meet him there.

Reading in connection with this letter the ninth article of the tripartite agreement, wherein it is provided that all of the bonds, over and above the $650,000 pledged to secure the payment of the notes, were "hereby appropriated" (1) to the purchasers of said notes their said bonus of $65,000; (2) to the finance company $80,000 in full payment of all its claims for commission for negotiating said $800,000 of said bonds,—it is difficult to avoid the conclusion that this $80,000 was turned over to the

finance company in payment of their services rendered and to be rendered in connection with the Mason & Jillson transaction. In signing this contract Brown must have known, or was bound to know, if he did not fully realize it in fact, that the finance company would interpret the ninth article in accordance with Short's letter, or as a carrying out of his proposition in that letter, that the negotiation with Mason & Jillson should be treated as a sale of the bonds. It is well-settled principle of law, and one which, I think, applies here, that, where the language of a promisor may be understood in more senses than one, it shall be interpreted in the sense in which he had reason to suppose it was understood by the promisee. · *Barlow* v. *Scott*, 24 N. Y. 40; *Hoffman* v. *Insurance Co.*, 32 N. Y. 405; *Potter* v. *Berthelet*, 20 Fed. Rep. 240.

So far as regards this article, Brown was the promisor, since he is the only party who has power to make the appropriation, and, if he had had Short's letter in mind, could hardly have failed to understand the meaning of the clause referring to the $80,000.

Indeed, the use of the words "are hereby appropriated" indicate pretty clearly a present intent to make a payment for services already performed, and perhaps, also, an advance payment for services contemplated and expected in the same connection. Indeed, it is quite manifest that certain services were performed in connection with the organization of the new company, the transfer of the property of the old company, and the engraving, issuing, and negotiating of the bonds and stock of the new company. Granted that this commission seems an exorbitant sum for the services contemplated, yet if Brown was the owner of these bonds,—and for all that appears in this regard he was such owner,—it was competent for him to pay such sums as he chose. Parties standing in the relation of the finance company are not usually modest in their exactions, and promoters of insolvent railway companies, who are looking about for aid in extricating their roads from financial difficulties, are generally required to pay a round sum in compensation. The expenses provided for in this particular transaction seem to have been as follows:

(1) A commission of 2½ per cent. on the amount of the loan raised by the finance company. Article 6.

(2) A commission of 10 per cent. upon the par value of the bonds and stock issued and negotiated. Article 9.

(3) Forty-five per cent. of the capital stock of the new company for the securing and marketing of its bonds. Article 10.

Also the following compensation under the tripartite agreement:

(1) A bonus of 10 per cent. on the amount of bonds pledged as collateral security to the purchasers of Brown's notes, (article 6,) amounting to $65,000, (article 9.)

(2) Fifty thousand dollars in bonds to Mason & Jillson for their services in the examination of the railway, and for said responsibility as indorsers. Article 9.

These commissions, aggregating nearly $195,000 in bonds, besides the stock, in a transaction involving but $800,000, certainly seem extremely liberal, and, if Brown had been acting as agent for others, it is possible

his principals might have just cause for complaint.   But, as he appears to have been himself the principal in the entire transaction, he must be held to his bargain.

The case of the finance company does not depend upon the reasonableness of these charges, but upon the question whether there was an agreement to pay them, and we must either adopt the theory that it was to receive the $80,000 for the negotiating of this transaction with Mason & Jillson, or that the company was content to accept the commission of 2½ per cent., which, under the circumstances, seems as much too little as the other seems too much.

But, conceding that the 80 bonds were deposited with the finance company as the property of Brown in trust for services thereafter to be performed in negotiating the bonds, the company was entitled to a reasonable time to perform those services, and Brown had no right to rescind this contract until there had been a breach on the part of the company. That the contract was expressly rescinded by Brown by letters of January 4, 1886, to Mason, to Jillson, and to the finance company is not denied.   Does the evidence show that there had been a breach of their contract on the part of the finance company?   The breaches relied upon in Brown's notice are the refusal to issue the stock of the new company in his name, the refusal to allow him to name a majority of the board of directors, and the failure to sell the bonds.

Our attention is not called to any provision of their agreements which determined in whose name the stock of the new company should be issued in the first instance.   It is true that article 11 of the first agreement provides that Brown is to be elected president of the new railroad company, and is to have 45 per cent. of the stock of such company, and the naming of a majority of its board of directors.   But this seems to be qualified to a certain extent by the fifth article of the tripartite agreement, which provides that all the full-paid stock of the Toledo & Indianapolis Company is to be issued and deposited with the finance company, and is to be disposed of as follows:   Upon payment of the loan, or in case of default of such payment, there is to be issued and delivered by said trustee to Mason & Jillson $360,000 of said stock; to said Brown, $408,000; and to said American Finance Company, $32,000 thereof,— "the same to be issued in the names of said parties, respectively."   There seems to be nothing in this article to indicate in whose name the stock was to be issued when deposited with the finance company, and prior to its disposition under the article.   Neither does this article refer to the stock of the new company, but apparently to the stock of the old.   It is quite possible that the parties understood that the new stock was to take the place of the old, and be subject to the provisions of this article. But, however this may be, it appears that a meeting of the incorporators of the new company was held at Toledo, March 26, 1885, at which all the incorporators were present, viz., White, Mason, Brown, Walker, and Follett, each subscribing to 1 share of stock, except Mason, who also subscribed for 7,995 shares, and certificates were issued accordingly. At the same day a meeting of the incorporators was held, at which all the stockholders were present, (Brown signing the call and acting as sec-

retary,) and all were elected directors, each receiving 8,000 votes, and each receiving all the votes cast, and the votes of all the subscribers to the stock. At the same day a meeting of the directors was held, at which Brown acted as secretary. At this meeting White was elected president of the company, Mason, vice-president, and Brown, general manager, by the unanimous vote of the board. Another meeting of the stockholders was then held, at which the action of the board of directors in directing the issue of paid-up certificates of stock in the name of the subscribers thereto was approved by the vote of every stockholder and subscriber. In his affidavit Brown says that, as soon as he ascertained that it was the purpose of the finance company to elect White president of the road, he remonstrated against it, and demanded and insisted on performance of the agreement that he should be made president, and only submitted because he could not help himself.

But, after having assented to the issue of the stock in Mason's name, and voted for the election of White as president and the other parties as directors, it hardly lies in his mouth to make use of this action as a reason for rescinding his contract with the finance company.

Was there a failure to sell the bonds, as required by the contracts? The only limit of time within which the bonds were to be sold is contained in article 14 of the original agreement, which provides that, unless the finance company raises the money necessary for the extension of the road to Columbus, or other points to be agreed upon, within one year from the date of procuring the loan, or from the date of the purchase of said road, then this contract for negotiating securities of and for said extension may, at the option of Brown, become null and void.

There was no limit of time within which the other bonds were to be sold to pay the loan, and, as the loan was made to run two years, it would seem that there was no obligation to dispose of the bonds before that time, but, in any event, as no complaint seems to have been made of their delay in selling the bonds prior to January 4, 1886, it is difficult to see how the fact that they had not been sold would authorize him to rescind the contract upon that ground. The questions arising upon these alleged breaches of contract by the finance company are not discussed at length in the briefs of the learned counsel for the exceptors; but, so far as we can see, the evidence does not establish the fact that a breach had been committed which authorized Brown to repudiate or put an end to the contract, and forfeit the commissions which the company were entitled to earn by its performance. Indeed, the real reason for declaring this forfeiture seems to have been, not so much a breach of the contract on the part of the finance company, as the fact that Brown in the mean time, on December 10, 1885, had entered into another contract with the Hocking Valley road, in which he seems to have contemplated another and different disposition of the bonds, stock, and property of the defendant company. Upon the whole, we see no reason for disturbing the report of the master upon the subject of these bonds.

The 27 Hazard bonds, so called, were deposited by Brown as security upon his contract of December 10, 1885, with the Hocking Valley Road. They were subsequently transferred by the railroad to Hazard under his

contract with the road of March 21, 1887.   Hazard swears that he paid $40,000 in cash for these bonds, and $22,500 in stock of the Toledo, Columbus & Southern Railroad.   Judge Burke, one of the exceptors, while on the witness stand, gave the following testimony with regard to these bonds:

"*Question.* Now, Mr. Burke, do you, before the master here, question the title of Mr. Hazard's bonds, or the bonds he holds?   *Answer.* I am not making any question about them either way; they do not belong to us. * * * I say we have nothing to do with them.   They do not affect me any. * * * I can only say, as far as we are concerned, we do not own them, unless it is under the general clause of our contract; and that would be subject, I suppose, to any rights of Mr. Hazard. * * * I had made a contract as vice-president of the Hocking road, * * * and under that there was some money advanced to Mr. Brown,—$24,500.   Mr. Brown having pledged twenty-seven of them at that time, * * * he asked me what he should do with them.   I directed him to deposit them in the Central Trust Company as an entirely special deposit, and take their receipt.   He delivered to me the receipt for the twenty-seven bonds, and the stock, whatever there was of it; and, while nothing was said about them, I supposed they took the place of something that the road was to have as a security for the money that had been advanced to Brown. * * * Afterwards Hazard told me he had purchased the contract and the bonds,—whatever went with it.   That is the extent of my knowledge upon that subject."

We do not perceive anything in this testimony to invalidate Hazard's title to these bonds, nor has any evidence been pointed out which satisfies us that the title of the holders of the remaining bonds is not good.

The exceptions to the report of the special master are therefore overruled.